# Exhibit 1

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.

SUPERIOR COURT
CIVIL ACTION
No. 1677-CV-01328

KEVIN RICHARDSON II and All Others )
Similarly Situated, )
    Plaintiffs, )
)
vs. )
)
THE UPS STORE, INC. and J&V )
LOGISTICS LLC, )
    Defendants. )

## MOTION FOR CLASS CERTIFICATION

Pursuant to M.G.L c. 93A, §9, Plaintiff Kevin Richardson II, on behalf of himself and all others similarly situated, ("Plaintiff") respectfully requests that this Court certify a class of present and former purchasers of Notary services from The UPS Store, Inc. and J&V Logistics LLC (collectively, "TUPSS") who were required to pay in excess of the statutory maximum of $1.25 fee for Notary services in violation of M.G.L. c. 262, § 41 and the Massachusetts Consumer Protection Statute M.G.L. c. 93A.  The proposed class period is from August 30, 2012 to the date of judgment.

As grounds for this motion, Plaintiff states that pursuant to M.G.L. c. 93A, § 9, the Plaintiff has established the requirements for class certification and Plaintiff incorporates by reference the facts and arguments made in his Memorandum in Support of Motion for Class Certification filed simultaneously herewith.  Plaintiff further states that, to the extent even necessary, this action meets all the requirements for class certification under Mass. R. Civ. P. 23.

Kevin Richardson II, and all Others Similarly
Situated,
By their attorneys,

Orestes Brown (BBO# 566431)
Bailey Buchanan (BBO# 651966)
Keith Sachs (BBO#634025)
D. Scott Dullea (BBO #670416)
METAXAS BROWN PIDGEON LLP
900 Cummings Center, Suite 207T
Beverly, MA  01915
978-927-8000

Dated: October _____ 2018

CERTIFICATE OF SERVICE

I hereby certify that on this day a true copy of the
above document was served upon the attorney of
record for each party by hand. *via electronic service*

Dated _____

2

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.                                              SUPERIOR COURT
                                                       CIVIL ACTION
                                                       No.  1677-CV-01328

                                              )
KEVIN RICHARDSON II and All Others            )
Similarly Situated,                           )
          Plaintiffs,                         )
                                              )
vs.                                           )
                                              )
THE UPS STORE, INC. and J&V                   )
LOGISTICS LLC,                                )
          Defendants.                         )
                                              )

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

This action arises from a scheme through which Defendant, The UPS Store, Inc. ("TUPSS"),

engaged in the unfair and deceptive practice of knowingly charging Massachusetts consumers at its

retail franchise stores in Massachusetts more for the services of a notary public than the statutory limit

allowed under G. L. c. 262, § 41 in violation of G.L. c. 93A and G.L. c. 222, §16.  The Massachusetts

Supreme Judicial Court has made clear that, under Massachusetts law, "the public who use the services

of the notaries public pay a statutorily set fee" pursuant to G. L. c. 262, § 41.  Quinn v. State Ethics

Com., 401 Mass. 210, 222 (1987).  See also Real Estate Bar Ass'n for Mass. v. Nat'l Loan Closers, Inc.,

2012 Mass. Super. LEXIS 354, *1, 30 Mass. L. Rep. 497 (2012) ("[t]he fees that may be charged for

such public services are fixed by law.  Mass. Gen. Laws ch. 262, § 41 provides that notaries public may

not charge more than $ 1.25 to notarize a document.")  At all times relevant to this action, the statutory

limit Massachusetts notaries public may charge to notarize a document is $1.25.[1]  See id.  See also G.L.

---

[1] On May 14, 2004, Governor Romney issued Executive Order No. 455, which provided guidance to notaries public and required notaries to charge the fee set forth in section 41 of chapter 262.  On October 6, 2016, Governor Baker signed into law Chapter 289 of the Acts of 2016, An Act Regulating Notaries Public to Protect Consumers and the Validity and Effectiveness of Recorded Instruments, which went into effect on January 4, 2017; and rescinded Executive Order

c. 262, § 41; Executive Order No. 455 (04-04) (May 14, 2004); Executive Order No. 571 (October 6, 2016) and G.L. c. 222 § 16(iv), all of which are attached hereto as Exhibit A.

Plaintiff, Kevin Richardson, like the class members he seeks to represent, used the services of a notary public at a TUPSS franchise location in Massachusetts and was repeatedly charged more than allowed under G.L. c. 262 § 41. The evidence produced to date shows that Plaintiff purchased notary services from the UPS Store located at 39 Dodge St., Beverly, Massachusetts ("the Beverly Store"), which is owned by Defendant J&V Logistics on at least five occasions on January 20, 2015, February 27, 2015, September 22, 2015, October 17, 2014 and February 9, 2016.[2] On January 20, 2015, February 27, 2015, and October 17, 2014, Mr. Richardson's wife also had her signature notarized. Id. For eight notarizations, Mr. Richardson and his wife were charged and paid $65.00 instead of the $10.00 proscribed by G.L. c. 262 §41 and c. 222 § 16 at $1.25 per notary. Id.

The overcharging for notary public services by TUPSS and its franchisees in violation of Massachusetts law was acknowledged to be "a time bomb" as early as 2012 by TUPSS' agent in charge of ensuring franchisee compliance with TUPSS rules and regulations.[3] Documents produced in class-discovery to date show that, during the period from 2012 through approximately February 2017 "the production time period"), the ninety-six (96) retail TUPSS franchise stores in Massachusetts notarized

---

No. 455, effective January 4, 2017. *See* Executive Order No. 571: Rescinding Executive Order No. 455, dated October 6, 2016. Both Executive Order No. 455 §6(6), effective May 14, 2004 through January 4, 2017, and Chapter 289 of the Acts of 2016, An Act Regulating Notaries Public to Protect Consumers and the Validity and Effectiveness of Recorded Instruments, G.L. ch. 222 §16(iv), effective January 4, 2017 and continuing, forbid a notary from performing a notarial act if "the notary public will receive as a direct result of the notarial act any commission, fee, advantage, right, title, interest, cash, property or other consideration exceeding the maximum fees provided in section 41 of chapter 262....".

[2] *See* Receipts produced by Plaintiff, Notary Journal Records and Electronic Journal View Records produced by Defendant J&V Logistics attached hereto Exhibit B.

[3] *See* Email chain, attached hereto as Exhibit C, between Arlington UPS Store Owner ("UPS brought to my attention that you have file a complaint regarding to our Notary Fee $5. This charge includes the standard MASS Notary fee $1.25 plus $3.75 on service charge. We will change it in our system to reflect the breakdown immediately"); Customer ("The service fee itself does not appear allowable; see: http://www.mass.gov/governor/administration/legal/notary/find-a-notary-public.html "in no case may a notary public charge more than the statutory amount for performing a notarization."); MBE, A UPS Company, Customer Relations Department ("If you would be so kind as to clarify your chares, as the state of Massachusetts shows that the maximum notary fee is $1.25 what would the service fee of $3.75 be for."); TUPSS Area Franchisee, LSV Inc.("this could be a time bomb"); and TUPSS Corporate Executives Jay Schlessinger and Mark Ferrante.

2

236,475 signatures and charged Massachusetts consumers, of which Plaintiff and his wife are two, $1,847,545,72 for these notarizations, which should have cost no more than $295,593.75.[4] TUPSS, through its royalty payments from franchisees, has profited from overcharging Massachusetts consumers at least $1,551,951,97 in violation of G.L. c. 222 §16; G.L. c. 262 §41 and G.L. c. 93A. This "time bomb" packs a payload of over $1.5 MILLION worth of ill-gotten gains generated by charging Massachusetts consumers more than the $1.25 statutory limit on notary fees in over 236,000 violations of Massachusetts law.[5]

Kevin Richardson II and All Others Similarly Situated (the "Plaintiffs"), hereby move this Honorable Court for class certification in the instant action pursuant to G. L. c. 93A, § 9(2), and Mass. R. Civ. P. 23. For all of the reasons set forth below, the Plaintiffs respectfully request that their Motion for Class Certification be **ALLOWED**.

---

[4] In response to Plaintiffs' First Request for Production of Documents ["RPOD"], TUPSS prepared and produced spreadsheets from information reported to TUPSS by individual Massachusetts Franchisees ("the TUPSS Point of Sale System (POS) Notary Sales Reports"). In letter dated December 11, 2017 from TUPSS' Counsel, TUPSS represented that these spreadsheets were produced specifically in response to Request Number 41: "Any and all documents related in any way to TUPSS'S Massachusetts Franchisees' sale or providing of Notary Service, including, but not limited to, register receipts, transaction records, point of sale software records, accounting records and journals of notary transactions." *See* Affidavit of Plaintiff's Counsel is attached hereto as Exhibit D. As an example, the TUPSS POS Notary Sales Reports TUPSS produced for Store 1101 and Store 2897, the Massachusetts Franchise stores that are now owned by Defendant J&V Logistics, Inc., and Deponent John Moran, store owner and TUPSS Certified Trainer, respectively, are attached hereto as Exhibit E. Plaintiff's Counsel has reviewed and tallied all of the transactions contained in the the TUPSS POS Notary Sales Reports TUPSS produced by TUPSS for all 97 TUPSS franchise stores during the production time period. *See* Exhibit D. The notary transaction spreadsheets show logging sequence numbers, business dates, and amounts charged, including notary fees, clerical fees, notary-additional signature fees, notary- additional seal fees, travel fees, and "store defined item" charges, etc., that are associated with notary services. Id. They also show annual totals for each category of fee listed. *See* Exhibits D and E.

Based on TUPSS Counsel's representations, limited testimony by Judith Milner, TUPSS, Vice President of Franchise Operations, ("TUPSS' Rule 30(b)(6) Deponent") and testimony by John Moran, who owns one TUPSS Retail Store and a 1/3 interest in another and who is also certified by TUPSS to be a Certified Trainer in Massachusetts, it is clear that the TUPSS POS Notary Sales Reports contain the "end of day" transaction data that TUPSS Retail Stores transmit to TUPSS every day. (*See* Deposition of John Moran, Franchisee Owner and TUPSS Certified Trainer, Deposition Transcript attached hereto as Exhibit F at 10:24-11:8; 14:14-16:6; 48:23-50:5 ("on a daily basis, all transactions get transferred to corporate [ . . . ]). TUPSS' Counsel stated on the record: "[T]he lawyers in this case asked TUPSS to extract from the point of sale data that they had available to them all of the information that had been input into the system as reflecting a notary-related SKU. [ . . . ] But in terms of available information to TUPSS, this relates to the available information about SKUs related to notary. [ . . . ]" (*See* Milner Deposition Transcript attached hereto as Exhibit G at 161:14 to 162:21.)

[5] The ill-gotten gains figure is significantly lower than the presumed 93A damages of – at the very least – $25.00 per violation multiplied by over 236,000 notarized signature violations. The latter figure, which easily eclipses $5.9 MILLION, represents only single damages under G. L. c. 93A.

## FACTUAL BACKGROUND

TUPSS is the franchisor of The UPS Store ("UPS Store") retail service centers throughout the United States. As of 2015, there were ninety-three (93) UPS Franchise Stores in Massachusetts alone, and currently there are ninety-seven (97). *See fn. 4.* Defendant J&V Logistics LLC ("J&V") is a limited liability company and franchisee of TUPSS that operates a UPS Store in Beverly, Massachusetts.

Since approximately 2012, the named Plaintiff, Kevin Richardson II ("Richardson"), has been charged more than $1.25 for notary public services on at least five occasions at the Beverly Store. *See* Exhibit B. Under Massachusetts law, it is unlawful to charge more than $1.25 per notarization. *See* G. L. c. 262, § 41 ("[T]he whole cost of noting, including recording and notices, shall in no case exceed one dollar and twenty-five cents."). Both Executive Order No. 455 §6(6), effective May 14, 2004 - January 4, 2017, and Chapter 289 of the Acts of 2016, An Act Regulating Notaries Public to Protect Consumers and the Validity and Effectiveness of Recorded Instruments, G.L. ch. 222 §16(iv), effective January 4, 2017 to date, forbid notaries from performing notarial acts if "the notary public will receive as a direct result of the notarial act any commission, fee, advantage, right, title, interest, cash, property or other consideration exceeding the maximum fees provided in" G.L. c. 262, § 41.

The Plaintiffs filed the first amended class action complaint against Defendants on September 13, 2016, alleging violations of G. L. c. 262, § 41 and G. L. c. 93A. This Court (Lauriat, J.) denied Defendants' motion to dismiss the complaint pursuant to Mass. R. Civ. P. 12(b)(6). (*See* "Memorandum of Decision and Order" attached hereto as Exhibit H). The Court found Plaintiffs had sufficiently pleaded violations of both G. L. c. 262, § 41, and G. L. c. 93A, and that TUPSS exercises sufficient control[6] over its franchisees to render it vicariously liable for their actions. *Id.*

---

[6] In a similar case in Kentucky, *Teresa Long v. The UPS Store, et al.*, No. 15-000695, Jefferson Circuit Court, Div. 10, Kentucky (Bisig, J., Order Regarding Renewed Motion for Summary Judgment, May 18, 2018) (hereinafter "*Long*"), the Court denied TUPSS' summary judgment on the issue that is was not liable for franchisees' charging of more than the statutory limit on notary transactions. (Long is attached hereto as Exhibit I.) In *Long*, the Court provided a host of

reasons for its decision, including, but not limited to, the following: (1) "the franchisor is uniquely situated to prevent or correct unfair or unlawful business practices by the franchisee [especially where] [t]he sale of notary services is among the core purposes of the franchise relationship between TUPSS and the Franchisee Defendants"; (2) "TUPSS' corporate representative testified that TUPSS specifically requires its franchisees to offer notary services"; (3) The pricing for such services is likewise central to the franchise relationship, particularly given that TUPSS receives a portion of each notary fee charged by the Franchisee Defendants"; (4) "Moreover, as franchisor TUPSS could be seen by a trier of fact to be uniquely situated to ensure that its franchisees comply with legal regulations and requirements governing the pricing of notary services, particularly given that legal compliance is not a mere day-to-day operational matter rather an overarching determination of business policy." (*Long*, No. 15-000695, Jefferson Circuit Court at 8.) Based on this, as well as other evidence, the *Long* Court noted that "a reasonable juror [could] conclude that because TUPSS' therefore had a financial interest in the notary fees charged by the Franchisee Defendants, it may have exercised some control over the setting of those fees." All of the elements pointed to by the *Long* Court exist here. In addition to the evidence cited in the Factual Background section, *infra*, the following evidence exists: ███████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████████████████████

All Massachusetts TUPSS franchises, in fact, offer notary services. (*See* Milner Depo., **Ex. G** at 54:21-23); TUPPS receives revenues from the Massachusetts franchisees based on fees charged and collected for each franchisee's providing notary services, which are determined through a required monthly royalty report that TUPPS receives from the franchisees. (*See Id.* at 55:3-21; 56:6-13; 57:3-7); The revenue showing up under the notary category on these royalty reports includes all of the fees that are linked to notary including the $1.25 charge and any service fee, like a clerical fee that's related to the provision of notary services. (*See* Moran Depo., **Ex. F**, at 38:24-39:9); TUPSS "Center Operations Manual"; a document "that talks about -- provides tips, guidance, the day-to-day operations of a franchise." (*See* Milner Depo., **Ex. G** at 61:9 62:2); Massachusetts franchises are required to comply with the standards set forth in the TUPSS Center Operations Manual. (*See id.* at 62:3-9; 106:16-107:10); TUPSS requires Massachusetts franchisees to use particular point of sales software ("POS") in operating each franchise. (*See Id.* at 63:14-20); TUPSS requires each Massachusetts franchise to be operated by a certified manager trained by TUPSS. (*See Id.* at 63:21 through 64:9); Certified Trainers are usually TUPSS franchisees who are approved by TUPPS following a three- or four-day course administered by TUPPS. (*See Id.* at 67:9-25); Massachusetts franchisees are subject to TUPSS inspections without prior notice. (*See Id.* at 69:6-23); All Massachusetts franchisees are audited by TUPSS on a quarterly basis. (*See Id.* at 71:2-7.) Reports of those audits are kept on a database located at TUPPS. (*See Id.* at 72:8); "[T]he area franchisees help [TUPSS] with being its "feet on the street" to conduct quarterly visits." (*See Id.* at 73:13-25); "[I]t generally [has] been the practice of The UPS Store, Inc. audits to have Mr. Lieberman or his staff conduct those audits." (*See Id.* at 75:10-15); Paul Lieberman, the owner of LSV, Inc., is the TUPSS Area Franchisee in Massachusetts. (*See Id.* at 74:19-24); LSV, Inc. is the TUPSS designated representative. (*See* Lieberman Depo., **Ex. K**, at 74:15-76:10); TUPSS monitors and controls what Massachusetts franchisees charge for products and services. (*See* Milner Depo., **Ex. G**, at 98:19-99:4); TUPSS uses the same Franchise Agreement form for all Massachusetts Franchisees and that standard form governs the contractual relationship. (*See Id.* at 106:4-15). All Massachusetts franchisees, through their Franchise Agreement, are required to comply with Massachusetts law. (*See Id.* at 109:4-7); TUPSS trains Massachusetts franchisees how to prepare for notary responsibilities. (*See Id.* at 115:9-24); All TUPSS certified trainers are expected to train franchisees from TUPSS drafted guidebooks and other materials. (*See Id.* at 117:9-22); TUPSS certified trainers train franchisees to ███████████████████████████████████████████████████████ (*See Id.* at 117:25-118:7); The first check of the skills demonstration on notary services is to ██████████████████████████████████ (*See Id.* at 118:8-21.) Such training regarding state regulations is discussed by the approved, certified TUPSS trainer, who "would be familiar with the rules and regulations of the state in which they are doing business." (*See id.* at 118:23-119:8); TUPSS written training materials further discuss notary services and specifically discusses ███████████████████████████████████ ██████████████████████████████████████████ (*See id.* at 121:1-18); The TUPSS Certified Trainer testified that he instructed Massachusetts Franchisees, knowing of the $1.25 limit, to charge $1.25 and $8.75, for a total of $10.00 between the service fee and actual notary fee. (*See* Moran Depo., **Ex. F**, at 32:?-33:1-13) ; ████████████████████████████ ████████████████████████████████████████████████████ █████████ — receive compensation in the form of royalties for services, including notary services, provided by the Massachusetts Franchisees. (*See* Milner Depo., **Ex. G**, at 134:7-16.); TUPSS receives a daily revenue report from each Massachusetts Franchisee. (*See id.* at 144:15 through 145:10.); ██████████████████████████████████████████████████████████████████████y ██████████████████████████████████████████████████████████nd

Since then, Plaintiffs have learned the following through discovery conducted to date. First, TUPSS requires all Franchisees to provide Notary Services and evidences its awareness of state notary laws and their limits on notary pricing in TUPSS Center Operations Manual for Notary Services that is provided to each Franchisee and is attached hereto as Exhibit N. (*See* Exhibit N at TUPSS-0010259-TUPSS-0010262). The Center Operations Manual for Notary Services states:



*See id.* Second, TUPSS Massachusetts Franchisees represent approximately ninety percent of locations in Massachusetts at which notary services are available to the public. *See* Exhibit Q at JV Confidential 1476, 1463-1465 (TUPSS Area Franchisee, Paul Lieberman, attachment to email dated March 19, 2017, to Massachusetts Franchisees: "If you Google Notary Public, you will understand that The UPS Stores probably represent over 90% of the sites to which a consumer can go.").

Third, TUPSS controls its franchisees through the use of the Area Franchisee. According to J&V Logistics, "TUPSS controls the franchisee and is responsible for pricing policies, compliant audits are done, royalty had been paid on all such income from notarization." *See* Exhibit R at JV Logistics



1466-1467 (Email from Vikrant Malik, J&V Logistics, to Paul Lieberman, TUPSS Area Franchisee, dated April 10, 2017). John Moran, an owner of one TUPSS store and 1/3 interest in a second TUPSS store and a TUPSS Certified Trainer ("the TUPSS Certified Trainer") confirmed this and testified that "franchisees agree to be bound by the operations manuals" and are under the jurisdiction of the Area Franchisee in their franchise agreement or operations manual.  *See* Exhibit F at 57:14-21. The TUPSS Certified Trainer further testified that the Area Franchisee speaks for UPS headquarters, is the representative of UPS headquarters in Massachusetts, performs the quarterly audits at franchisee stores and is responsible for making sure that the UPS franchisees are compliant with all the rules and regulations required by UPS headquarters.  *See id.* at 22-2:16.

  Pursuant to the TUPSS Center Operations Manual, ██████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████ *See* Exhibit P at LSV, Inc. 00001067. TUPSS Rule 30(b)(6) Deponent confirmed this and testified that the TUPSS Area Franchisee is required to conduct quarterly center visits with the franchisees in its area and that TUPSS uses "the area franchisees to help [TUPSS] with being its 'feet on the street' to conduct quarterly visits." *See* Exhibit G at 73:13-25. She further testified that for the period of time that she had "been vice president of operations since 2013, [. . .] it generally [has] been the practice of The UPS Store, Inc. audits to have Mr. Lieberman or his staff conduct those audits." *See id.* at 75:10-15. Similarly, the TUPSS Center Operations Manual defines the Area Franchisee to be TUPSS' Agent.[7] Paul Lieberman, the owner of LSV, Inc., is the TUPSS Area Franchisee in Massachusetts, *see* Exhibit G at 74:19-24, and he testified

---

[7] ██████████████████████████████████████████████████████████████████████ U██████████████████████████████████████████████████████████████████████ w██████████████████████████████████████████████████████████████████████ a██████████████████████████████████████████████████

that LSV, Inc. is the TUPSS designated representative. *See* Exhibit K, at 74:15-76:10. Fourth, TUPSS requires Massachusetts Franchisees to be trained by TUPSS certified trainers on the provision of notary services in Massachusetts and the approved curriculum requires that TUPSS certified trainers discuss with Massachusetts Franchisees the following:



*See* Exhibit L at TUPSS_0026809, TUPSS-0026811-0026828. Fifth, TUPSS trains Massachusetts Franchisees to ███████████████████████████ *See id.*

Sixth, as evidenced by the TUPSS Franchise Disclosure Document and its Operations Manual, by which Massachusetts Franchisees are bound, TUPSS controls the Franchisees and reserves the right to change at any time the standards and specifications by which Franchisees are bound to comply. The TUPSS Franchise Disclosure Document reads in relevant part:

*See* Exhibit M at TUPSS_0005880, TUPSS_0005944-0005945 (emphasis added).

Furthermore, TUPPS evidenced its control and awareness of notary pricing by its Massachusetts Franchisees through various email correspondence produced. In an email exchange between Michael Albanese, the TUPSS Area Franchisee Store Support Manager, *see* Exhibit K at

8

110:15-111:24, and the owner of Franchise Store 4762, attached hereto as Exhibit S, on July 30, 2013, UPS Store #4762 writes to Albanese, "I increased my notary price as you suggested to $10. Now I have a customer who is insistent that we provide documentation explaining why we are charging more than the $1.25 that he claims is the max allowed by law." *Id.* To which, the TUPSS Area Franchisee Store Support Manager replied:

> [t]he customer is correct about the notary fee being only 1.25 the extra amount is a service fee. There is no documentation to give them it is just a fee. It should have two separate items on the receipt one for the notary charge and the service fee. It should be set up in your POS this way.

*Id.* In 2016, the TUPSS Area Franchise also wrote to Massachusetts Franchisees: "it has come to LSV's attention that some of you are still charging $10 for a Notary. There has been a request by our attorney and myself to cease and desist, per the request of the lawsuit that was filed. By continuing to charge $10, until we resolve the issue through the MA Legislature, you are jeopardizing not only the lawsuit but all of the sores in Massachusetts." *See* Ex. T attached hereto at JV Confidential 1463-1464.

Seventh, TUPSS, has at all times relevant to this action, been fully aware and has admitted that the statutory limit that can be charged per notary is $1.25. A draft letter the TUPSS' Area Franchisee sent to Massachusetts Franchisees states "a serious complication is that Massachusetts' law requires us to only charge $1.25 per signature." *See id.* at JV Confidential 1476.

And TUPSS has known this limit existed since as early as 2012 and continued to profit from the overcharging of notary customers. In one instance,[8] after a customer complained about the

---

[8] In another instance, on 6/25/2012, The UPS Store in Brookline Village wrote to the TUPSS Area Franchisee "[h]ere's that reminder of my notary service issue. For now, I'm charging an 'OnSite' fee rather than a service fee. If I get another complaint, I might have to force customers to buy something with notary service or not do it at all." To which, the TUPSS Area Franchisee wrote back "Nothing for nothing, Dominic, but how can you be sure that the call actually came from the governor's office...." And then forwarded to Lieberman and internally within the Area Franchisee the email with the note "FYI- Dominic Galang has received two complaints about his surcharge for notary services the latest generating a call directly from the governor's office." *See* email thread attached hereto as Exhibit U. On another occasion, on March 15, 2016, The UPS Store 6460 wrote to the TUPSS Area Franchisee: "We have been charging customers $10 as per your guidelines. We did not sent the rates on our own....". *See* email thread attached hereto as Exhibit V at LSV, Inc. 00001221.

overcharging, MBE, a UPS Company, Customer Relations Department representative informed the TUPSS Area Franchisee, TUPSS Executives[9], a Store Owner and the customer: "if you would be so kind as to clarify your charges, as the state of Massachusetts shows that the maximum notary fee is $1.25 what would the service fee of $3.75 be for." *See* fn. 3.   TUPSS Area Franchisee, LSV Inc., responded internally "this could be a time bomb." *See id.*

Instead of defusing this "time bomb", TUPSS and its Area Franchisee continued to profit from the overcharging of TUPSS customers for notary services through the royalty it collects from franchise stores.  TUPSS receives royalty "revenue based on total sales reported through a royalty report," *see* Exhibit G at 55:14-21; the royalty report shows the revenue collected from the provision of notary services and TUPSS receives a royalty on the money collected from the provision of notary services. *See id. at* 56:3-7.  The revenue captured under the notary category on these royalty reports includes all of the fees that are linked to notary transactions including the $1.25 charge and any service fee, like a clerical fee that's related to the provision of notary services.  *See* Exhibit F at 38:24-39:9. Lieberman testified that the Area Franchisee gets "50 percent of the royalties that the [ . . . ] Massachusetts Franchisees pays to TUPSS." *See* Exhibit K at 40:9-13.

The TUPSS Certified Trainer testified that the TUPSS Area Franchisee asked him to give a talk on notary fees on February 26, 2014 at a meeting attended by 60 to 80 TUPSS store owners, Area Franchisee employees, and possibly someone from TUPSS Headquarters or corporate, at which he "encourage[d] them to chare more [for notary fees]" and "explain[ed] what my practice is in charging." *See* Exhibit F at 26:5-27:12. He explained that, at the time his practice was to charge $1.25 and $8.75, so a total of $10,00 between a service fee and actual notary fee. He further testified that he

---

[9] The LinkedIn pages for Mark Ferrante Sales-Non-Traditional Sales at The UPS Store, Inc. and Jay Schlessinger, Operations Manager at The UPS Store, Inc., who are copied on this email, are attached hereto at Exhibit W. *See also* Exhibit K at 157:5-158:6.

talked to everybody at the quarterly meeting about charging that amount of money in February 2014. *See id. at* 32:24-33:1-13. This quarterly meeting was held two years after the "time bomb" observation.

This practice through which TUPSS Massachusetts franchisees systematically charged in excess of the statutorily allowed notary fee, by recording the overage charges as "clerical fees", "document preparation fees", and or "store defined items" is reflected in the TUPSS POS Notary Sales Reports discussed herein. *See e.g.* Exhibit E (TUPSS' POS Notary Sales Reports for Stores 1101 and 2897). The TUPSS Certified Trainer testified that these additional charges are linked to the notary charge in the TUPSS point of sale system franchisees are required to use and that TUPSS headquarters can see that the clerical fee is linked to the notary fee. *See* Exhibit F at 49:22-50:5. He further testified that TUPSS headquarters can see how many notary transactions franchisee stores did and how much each charged per transaction. *See id.* When asked if TUPSS's information system, whether it be a point of sales system of or other electronic data collection system, contain information regarding the amounts charged by Massachusetts franchisees for Massachusetts notarization services, *see* Exhibit G at 149:24-150:4, TUPSS Rule 30(B)(6) Deponent testified that TUPSS "POS system would have totals of the transactions charged." *See id.* at 150:6-7.

## EVIDENCE OF PERVASIVE OVERCHARGING FOR NOTARY SERVICES

The TUPSS' POS Notary Sales Reports produced by TUPSS for each TUPSS Massachusetts franchise store show the total volume of notary sales transactions from 2012 through early 2017, as well as the total monies collected by that given store for the notary sales. (*See* Affidavit of Counsel, at Ex. D and POS Notary Sales Report for Stores 1101 and 2897, at Exhibit E). Referring to these TUPSS' POS Notary Sales Reports, the TUPSS Rule 30(B)(6)Deponent testified that TUPSS document production of the numbers "regarding the amounts charged for notarization services in Massachusetts" was accurate. *See* Exhibit G at 150:9-12 and 153:4-17.

11

Plaintiffs have tallied the TUPSS' POS Notary Sales Reports for all stores and presents the attached summary spreadsheet and Affidavit of Counsel which contain: (1) the total volume of and dollar amounts charged for notarized signatures and additional notary signatures per store and the grand total provided by all 97 TUPSS stores; and (2) the total volume of and dollar amounts of additional charges tacked on to notarized signatures and additional notary signatures per store and the grand total of these overcharges provided by all 97 TUPSS store. (*See* Affidavit of Counsel, at Ex. D The ninety-six (96) retail TUPSS franchise stores in Massachusetts notarized 236,476 signatures across the Commonwealth from 2012 until approximately February 2017. *Id.* The total amount of money TUPSS charged for those 236,476 notarized signatures, including all the impermissible fees, is $1,857,545.72. *Id.* These transactions should have cost no more than $295,595.00. *Id.* Based on the total amount charged for notarized signatures divided by the total number of notarizations performed, TUPSS charged $7.85 on average for any single given notary public service, which is over six (6) times the statutory allowed amount. *Id.* Based on the total amount charged for notarized signatures minus the statutory amount TUPSS was legally allowed to charge (236,476 X $1.25 = $295,595.00), TUPPS, its Area Franchisee and Massachusetts Franchisees collected and profited from $1,561,950.72 in ill-gotten gains generated by charging Massachusetts consumers more than the $1.25 statutory limit on notary fees in over 236,000 violations of Massachusetts law. *Id.*

## ARGUMENT

When seeking certification whether under G.L. c. 93A or Mass. Rule of Civ. Proc. 23, "the plaintiffs 'do not bear the burden of producing evidence sufficient to prove that the requirements [of class certification] have been met," but need only provide 'information sufficient to enable the motion judge to form a reasonable judgment' that the class meets the relevant requirements." Bellerman v. Fitchburg Gas and Elec. Light Co., 470 Mass. 43, 51-52 (2014) (Bellerman I) (quoting Weld v. Glaxo Wellcome Inc., 434 Mass. 81, 87 (2001). "When evaluating a motion for class certification, a plaintiff's

theory is the guide." Escorbor v. Helping Hands Co., 2017 Mass. Super. LEXIS 162, *10. While a judge is afforded broad discretion in allowing or denying class certification, **"pursuant to G. L. c. 93A, [a judge's] discretion to deny class certification is tempered by the 'public policy of the Commonwealth [which] strongly favors G. L. c. 93A class actions.'"** Bellerman v. Fitchburg Gas and Elec. Light Co., 475 Mass. 67, 71 (2016) (Bellerman II) (quoting Feeney v. Dell Inc., 454 Mass. 192, 200 (2009))(emphasis added). "A judge therefore has less discretion to deny class certification under G. L. c. 93A than under Mass. R. Civ. P. 23(b)...." Morgan v. Massachusetts Homeland Insurance Company, 91 Mass. App. Ct. 1, 6 (2017).

I.      **Class Certification Pursuant to G. L. c. 93A, § 9(2)**

Plaintiffs may bring a class action under G. L. c. 93A[10] if they can show that they may seek relief for an unfair or deceptive act or practice where that act or practice "caused similar injury to numerous other persons similarly situated," and that they would "adequately and fairly represent[ ] such other persons." Bellermann I, 470 Mass. at 52-53. A judge considering certification under G. L. c. 93A must bear in mind the "'pressing need for an effective private remedy' ... and that 'traditional technicalities are not to be read into the statute in such a way as to impede the accomplishment of substantial justice.'" Id. (internal citations omitted). The Supreme Judicial Court has opined that "the loss of an individual consumer's right to bring a **class action** negatively affects the rights of those unnamed class members on whose behalf the **class action** would proceed. [ . . .] [T]he right to participate in a **class action** under G. L. c. 93A is a public -- not merely a private -- right: it protects the rights of consumers as a whole." See Feeney, 454 Mass. at 202 (citing *Muhammad v. County Bank*,

---

[10] With respect to class actions, G. L. c. 93A, § 9(2) provides in pertinent part:
Any persons entitled to bring [an action under 93A, § 9(1)] may, if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly injured and situated persons . . . .

189 N.J. 1, 20, (2006) ("without the availability of a **class-action** mechanism, many consumer-fraud victims may never realize that they may have been wronged"). "The right to a class action in a consumer protection case is of particular importance where, [as in the instant case], aggregation of small claims is likely the only realistic option for pursuing a claim." See id. at 202.

A.    Illegally overcharging consumers for notary public services in violation of G. L. c. 262, § 41 and Massachusetts public policy is unfair or deceptive conduct in violation of G. L. c. 93A

"G. L. c. 93A, § 2(*a*) [ . . . ], declares unlawful 'unfair or deceptive acts or practices in the conduct of any trade or commerce'; § 2(*c*) then provides, '[t]he attorney general may make rules and regulations interpreting the provisions of subsection 2(*a*) of this chapter.' The Attorney General has, inter alia, defined an act or practice as a violation of [G. L. c. of 93A] if: '(3) It fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof *intended to provide the consumers of this Commonwealth protection....*'" McGonagle v. Home Depot, U.S.A., Inc., 75 Mass. App. Ct. 593, 600-601 (2009).

The role of the notary public as a public servant in Massachusetts was adroitly summarized by this Court (MacLeod-Mancuso, J.):

> **In Massachusetts a notary public is a public servant performing a public duty. They promote, serve, and protect the public interest** by administering oaths and affirmations; performing acknowledgments and jurats and witness signatures; issuing subpoenas; protesting commercial papers; and being present at the remove of the contents of bank safe deposit boxes and by acting as independent witnesses in a variety of situations. **The fees that may be charged for such public services are fixed by law. G. L. c. 262, § 41 (notaries public may not charge more than $1.25 to notarize a document).**

Real Estate Bar Ass'n for Mass. v. Nat'l Loan Closers, Inc., 2012 Mass. Super. LEXIS 354 at *9 (MacLeod-Mancuso, J.)(Nov. 30 2012)(emphasis added). By charging statutorily impermissible fees for notary public services in violation of G. L. c. 262, § 41, TUPSS has "failed to comply with" an existing statute that this Court has made clear is intended to provide Massachusetts consumers

protection by setting a fee limit for those services. Id.   Indeed, Massachusetts' Notary law, Chapter

289 of the Acts of 2016, is titled "*An Act Regulating Notaries Public to Protect Consumers* and

the Validity and Effectiveness of Recorded Instruments." The Court, (MacLeod-Mancuso, J.),

somewhat prophetically given the instant allegations against Defendants, makes clear it is contrary to

Massachusetts law and public policy for a private entity to profit from notary public services:

> It is contrary to Massachusetts law and public policy for a private entity to aggregate
> the services of notaries public, or any public officials who exist to provide a public
> good, and to sell those services as a commercial good. G. L. c. 262, § 41 (notaries
> public may not charge more than $1.25 to notarize a document).

Id. at *9-10.

TUPSS conduct is clearly unfair and deceptive pursuant to 940 Code Mass. Regs. § 3.16(3)

and meets the common law definition of unfair and deceptive as well.[11] This Court has already

concluded that Plaintiff has adequately alleged that Defendants charged more than the statutorily

defined maximum price for notary services (and otherwise complied with the procedural requirements

of G.L. c. 93A) and stated a plausible claim that Defendants' conduct constitutes an unfair or deceptive

practice in violation of G.L. c. 93A. The Court need not revisit its prior rulings. See Silva v. Todisco

Servs., 2018 Mass. Super. LEXIS 23, *15, 34 Mass. L. Rep. 647, 2018 WL 1413763 (certifying

consumer class action and refusing to address argument made in support of defendant's unsuccessful

motion to dismiss.) TUPSS' brazen violations of G. L. c. 262, § 41, a statute designed to protect the

public from exploitation of notary public services by corporations such as TUPSS, constitute the very

definition of unfair or deceptive conduct in violation of both G. L. c. 93A, § 2 and 940 C.M.R.. 3.16(3).

B.   TUPSS' unfair or deceptive conduct has caused similar injury to hundreds of
thousands of similarly situated individuals across the Commonwealth.

---

[11] Factors to consider in determining whether conduct is unfair or deceptive include: "(1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and,] (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." PMP Associates, Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975).

"To pursue a class action under G. L. c. 93A, plaintiffs must show that the putative class members suffered 'similar,' although not necessarily identical, injuries as a result of the defendant's unfair or deceptive conduct." Bellerman I, 470 Mass. at 53. Plaintiffs however are not required to fulfill the more exacting standards of common law class certification governed by Mass. R. Civ. P. 23. As the Supreme Judicial Court has explained:

> Although the requirements of rule 23(a) provide a useful framework for analysis, we have cautioned a judge deciding a motion for class certification under G. L. c. 93A to avoid equating the similarity requirements of rule 23(a) with requirements of § 9(2) that the parties seeking certification are similarly situated and have suffered a similar injury as members of the class they seek to represent.

Aspinall v. Philip Morris Cos., Inc., 442 Mass. 381, 391 (1975). "The class action provisions of G. L. c. 93A also have "a more mandatory tone" than does rule 23 in that they omit the predominance and superiority elements of rule 23 (b)." Bellermann I, 470 Mass. at 53-54 (internal citations omitted). Plaintiffs must show that they can establish causation of such similar injury on a class-wide basis. Id.

The records obtained to date show that, under TUPSS' pricing scheme, for eight notarizations, the Plaintiff and his wife were charged and paid $65.00 for services that, as mandated by law, G.L. c. 262 §41 and c. 222 §, 16 should cost no more than $10.00. Based on the discovery which TUPSS provided, it is evident that TUPSS' overcharging for notary public services was not limited to the named plaintiff or the Beverly Store. To the contrary, the emails between TUPSS stores and the TUPSS Area Franchisee discussing how to overcharge customers by breaking out fees separately, the testimony of the TUPSS Certified Trainer regarding the speech he gave at the Quarterly Meeting to explain the practice of breaking out fees and the data provided by TUPSS confirms the Plaintiffs' allegations that TUPSS was engaging in the unlawful, unfair or deceptive practice of overcharging for notary public services across all of its retail franchise stores in the Commonwealth, amounting to hundreds of thousands of violations and causing similar injury to thousands of consumers.

16

Notaries at TUPSS retail franchisee locations notarized 235,476 signatures across the Commonwealth from 2012 through February 2017, the date through which data was provided. (See Ex. C). The average cost to notarize a document at any given TUPSS retail franchise store at any time between 2012 and February 2017 was $7.81. (Id.) That is over six (6) times the statutory allowed amount of $1.25. The putative class members were all charged more than the $1.25 statutorily allowed for notarizations and suffered a similar injury through TUPSS' overcharging scheme.

C.    Plaintiff adequately and fairly represent the putative class members

"To pursue a class action under G. L. c. 93A, plaintiffs must show that he "adequately and fairly represents such other persons." Bellermann I, 470 Mass. at 52-53. A plaintiff will make this showing if his interests are aligned with the interests of the other class members and his counsel is experienced and competent in conducting consumer class action ligation. See Silva, 2018 Mass. Super. LEXIS 23, *19, 34.

Plaintiff has claimed similar injuries arising from the same conduct affecting absent class members across the Commonwealth and his interests do not conflict with those of the absent class members. He was compelled to pay more for the services of a public official by TUPSS who has cornered the market on the provision of notary public services. As relief, Plaintiff seeks statutory damages, disgorgement of the illegal fees and injunctive relief that "that all UPS Stores immediately cease and desist from charging notarization fees in excess of what is legally allowed by M.G.L. c. 262 § 41" and be required to provide training to ensure compliance with Massachusetts notary law. Disgorgement of TUPSS' ill-gotten gains will benefit all members of the class and injunctive relief will apply equally to the benefit of all class members. Additionally, proposed class counsel have considerable experience in the areas of consumer protection litigation and class action litigation. They are currently certified class counsel by this Court (Tabit, J.) in another consumer protection case and have settled with court approval numerous consumer protection class action lawsuits. Additionally,

17

as the voluminous and damning evidence obtained to date through discovery and depositions demonstrates, counsel have devoted significant resources and vigorously pursued Plaintiffs' present claims before this Court.

For all of these reasons, and in accordance with the longstanding policy in the Commonwealth favoring 93A class actions, class certification pursuant to G. L. c. 93A, § 9(2), is both necessary and proper here in order to effectuate justice for the citizens of the Commonwealth and hold TUPSS responsible for its unfair or deceptive conduct.

## II.    Class Certification Pursuant to Mass. R. Civ. P. 23

Because the Plaintiffs meet the standard for class certification pursuant to G.L. c. 93A, they need not be certified pursuant to Mass. R. Civ. P. 23, as well.  However, the Plaintiffs also meet the requirements for class certification pursuant to Mass. R. Civ. P. 23, which requires (1) numerosity of class making joinder impracticable, (2) commonality of law and facts, (3) typicality of claims or defenses of named plaintiff and putative class, and (4) adequacy of representation.  Under Mass. R. Civ. P. 23(b) further requires predominance of class issues and that class action is the superior method for adjudication.  "To support class certification under rule 23, plaintiffs must satisfy the four elements of the rule 23(a) and the two additional elements of rule 23(b)."  Bellerman I, 470 Mass. at 53.  The Plaintiffs will address each of the Rule 23 requirements in turn:

### A.    Numerosity

Joinder of all class members as individual plaintiffs is "impracticable" within the meaning of Rule 23 if doing so would be "impractical, unwise or imprudent;" plaintiffs need not show that joiner is "impossible or incapable of being performed." Brophy v. School Comm. of Worcester, 6 Mass. App. Ct. 731, 735 (1978).  As the notary journal records[12] and notary transaction spreadsheets

---

[12] In a brilliant twist of fate, the same statute Defendants conspired to violate through pricing schemes, involving various POS SKUs and misleading codes and fees, required them to maintain records of their victims.  In this case, although there are thousands of putative class members, their identities and the amounts paid by them in excess of the

indicate, there have been hundreds of thousands of violations of G. L. c. 262, §16 and there are thousands of class members who may be entitled to damages with respect to unlawful notary charges. While the notary journals will identify TUPSS' overcharged victims, joining all class members as individual plaintiffs would add significant expense without any offsetting advantage. "[W]hen joinder is impracticable, a class of 50 or 60 satisfies the numerosity requirement [under Mass R. Civ. P. 23(a)]." DiTondo v. GMC, 2005 Mass. Super. LEXIS 698 at *4 (Gershengorn, J.)(quoting Holton v. L.F. Rothschild, 118 F.R.D. 280, 282 (D. Mass. 1987)). Here, the putative class exceeds this 50 or 60 threshold hundreds if not thousands of times.

B.    Commonality

"The commonality requirement is met when the class members have a common interest that arises out of a common relationship to a definite wrong, and all class members have the right to seek the same relief against the defendants. Spear v. H.V. Greene Co., 246 Mass. 259, 266 (1923). "It is not essential that the interest of each member of the class be identical in all aspects with that of the plaintiffs." Id. Courts have given "permissive application to the commonality requirements." Fletcher v. Cape Cod Gas Co., 394 Mass. 595, 606 (1985) (noting decisions under Fed. R. Civ. P. 23(a))." Here, not only are the questions of law or fact common to the class, they are identical. The only questions presented to establish liability is whether the members of the putative class were charged an unlawful amount for the notary public services they received at a TUPSS retail store in violation of G. L. c. 262, § 41 and whether TUPSS is liable for this overcharging time bomb. Even if an individualized inquiry

---

statutory limits, are statutorily required to be recorded by the notaries at each of The UPS Store locations and thus are in the hands of TUPSS or their agents. Pursuant to the requirements of G.L. c. 222 §22, in relevant part, all notaries public "shall keep, maintain, protect and provide for lawful inspection a chronological official journal of notarial acts performed by the notary public" that records the date and time of the notarial act, the type of notarial act, the signature and printed name of each principal and witness, and the fee, if any charged." For instance, Defendant J&V Logistics has produced hundreds of pages of notary journals for the time period relevant to this action, including several of the instances in which Plaintiff purchased notary services at the Beverly Store. See id. These list the names and address of the consumers who purchased notary public services at the Beverly Store and indicate that the TUPSS franchisees are in possession of the names and addresses of all putative class members.

is necessary to determine damages for each Massachusetts consumer who was overcharged for notary public services in violation of G. L. c. 93A and G. L. c. 262, § 41, such a necessity at the damages stage does not preclude class certification where all other requirements are met. See Weld, 434 Mass. at 92.

C.    Typicality

"Typicality is established when there is 'a sufficient relationship . . . between the injury to the named plaintiff and the conduct affecting the class,' and the claims of the named plaintiff and those of the class 'are based on the same legal theory.'" Id. at 87 (alteration in original), quoting 1 H. Newberg, Class Actions §3.13, 3-76 (3d ed. 1992). "The typicality requirement may be satisfied by an allegation that the defendant acted consistently toward the members of a putative class." Fletcher, 394 Mass. at 606." Here, much like under the "commonality" requirement, the named Plaintiff's injury as a result of TUPSS' conduct, evidenced by the TUPSS POS Notary Sales Reports that demonstrate systemic and systematic overcharging throughout Massachusetts for notary services through service fees and other impermissible charges that TUPSS either i.) spread throughout the Commonwealth through the TUPSS Certified Trainer and AREA Franchisee or ii.) turned a blind eye to in order to profit from the illegal overcharges, is identical to the members of the putative class.[13] Because the named plaintiff's allegations of injury (paying unlawful notary fees) and conduct by TUPSS (knowingly overcharging in violation of, and or profiting from said violations of G.L. c. 262 §16) are identical to those of the putative class, the Plaintiffs have satisfied the "typicality" requirement of Rule 23.

D.    Adequacy of Representation

The adequacy analysis here does not deviate from that discussed under G.L. c. 9A above. Further, the "typicality" and "commonality" requirements "tend to merge with the adequacy-of-

---

[13] Clearly, TUPSS is responsible here. See, e.g., Colony of Wellfleet, Inc. v. Harris, 71 Mass. App. Ct. 522, 529 (2008) (finding ratification where the principal received proceeds of the sale and stating that "the law does not allow one to "purposefully shut his eyes to means of information within his own possession and control, having only that knowledge which he cares to have.")

representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest." Wal-Mart Stores, Inc., 131 S. Ct. at 2551 n.5. Because the Plaintiff has satisfied the "typicality" and "commonality" requirements and for the reasons discussed in the adequacy section under G.L. c. 93A Certification *supra*, which are incorporated and will not be reinstated herein, the named Plaintiff "adequately represents" the putative class and Counsel for the Plaintiffs are entirely competent to represent the putative class.

    E.    Predominance

    The predominance requirement is satisfied by "sufficient constellation of common issues that bind class members together" and "cannot be reduced to a mechanical, single-issue test". Weld, 434 Mass. at 92 (citing Duhaime v. John Hancock Mut. Life Ins. Co., 177 F.R.D. 54, 64 (D. Mass. 1997)(requirement is "'readily met' in 'cases alleging consumer . . . fraud'" where claim alleges single course of conduct). A conclusion that the overcharging for notary services is either a per se violation of 93A pursuant to 940 C.M.R.. 3.16(3) or is otherwise unfair and deceptive and that TUPSS is vicariously liable for the systematic overcharging of Massachusetts consumers would establish liability and "thereby "provid[e] a definite signal of the beginning of the end" of the litigation sufficient to satisfy rule 23 (b)'s predominance requirement." Id. (quoting Mertens v. Abbott Laboratories, 99 F.R.D. 38, 41 (D.N.H. 1983). One common question of law or fact may be found to predominate over individual questions so as to warrant certification of a class action. Ramos v. Registrars of Voters of Norfolk, 374 Mass. 176, 179-180 (1978) (denial of voter registration questions found to predominate over individual questions of domicile and residence). Here, for the same reasons the putative class meets the "typicality" and "commonality" requirements, they also meet the "predominance" requirement. The questions of law or fact for any given individual in this action is identical to the next; they not only predominate, they are exactly the same. Thus, the Plaintiffs have satisfied the "predominance" requirement of Rule 23.

F.    Superiority

Like predominance, judicial economy underlies the superiority requirement in class certification. Salvas, 452 Mass. at 362-63. The Supreme Judicial Court has made clear when common issues predominate, "judicial economy and consistency of result dictate class treatment." Weld, 431 Mass. at 93. Judicial economy favors class certification when a case "aggregates numerous small claims into one action, whose likely range of recovery would preclude any individual plaintiff from having his or her day in court." Id. As Chief Justice Gants, then an associate Justice of the Superior Court, artfully explained in a 93A class action case with a similar volume of injuries:

> If the Plaintiffs' allegations are proven, the defendants have fraudulently sold unbranded gasoline at branded prices, cheating customers of roughly a dime per gallon. Given the high volume of sales alleged, this scheme may have caused the class of customers to overpay millions of dollars for their gasoline over the period alleged. Yet, the amount of money lost by even the largest single gasoline customer is unlikely to reach many thousands of dollars, and the average customer's losses are likely to reach, at most, many hundreds of dollars. Without a class action, no customer would have the economic incentive to bring a law suit of the magnitude needed to prove these allegations. **Pragmatically, if a class is not certified to bring this claim, the claim will not be brought by an individual or group of individuals.**
> ***
> **Yet, the difficulty in identifying and locating members of the class and ascertaining the amount of damages should not defeat class certification where the alternative is to leave those aggrieved without a remedy and to permit those who allegedly perpetrated the fraud to keep the ill-gotten gains. If liability is established, creative ways will simply need to be fashioned to disgorge the fraudulently obtained monies and distribute them equitably to the aggrieved class.**

Olson v. Energy N., 1999 Mass. Super. LEXIS 45 at *15-17(Gants, J.)(emphasis added). Justice Gants concluded that a "class action is superior to other available methods for the fair and efficient adjudication of the controversy" where as is the case here, there was a scheme employed to overcharge thousands of customers totaling millions of dollars of illegal overpayment charges but only small damages to individual consumers. Id. He concluded that individual lawsuits were "utterly unrealistic and far inferior in efficient to a class action." Id. Similarly, here, given the sheer volume of statutory

22

violations but small average amount of damages to each consumer, a class action in the instant case is far superior and efficient to any other form of adjudication.

For all of these reasons, class certification is necessary and appropriate in the instant action pursuant to Rule 23.

## CONCLUSION

The Plaintiffs have alleged from the outset of this class action lawsuit that TUPSS has engaged in the unfair or deceptive act of overcharging for notary public services in violation of G. L. c. 262, § 41, and G. L. c. 93A, pervasively in all of its retail stores across the Commonwealth.

The data provided by TUPSS in discovery has confirmed the Plaintiffs' allegations and clearly shown that TUPSS' unfair or deceptive practices have caused similar injury to hundreds of thousands of citizens of the Commonwealth in violation of Massachusetts law and public policy.

For all of the reasons set forth above, and in order to effectively pursue a just and efficient resolution to the case at bar, the Plaintiffs respectfully ask that their Motion for Class Certification be **ALLOWED**.

Respectfully Submitted,

Plaintiffs,
By their attorneys,

Orestes G. Brown (BBO#566431)
Keith L. Sachs (BBO#634025)
Bailey Buchanan (BBO#651966)
METAXAS BROWN PIDGEON LLP
900 Cummings Center, Suite 207T
Beverly, MA 01915
(978) 927-8000
obrown@metaxasbrown.com
ksachs@metaxasbrown.com
bbuchanan@metaxasbrown.com

CERTIFICATE OF SERVICE
I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mailing/hand
Dated:

Dated:  October 10, 2018

23